Good morning. We will be pleased to hear argument in Lord & Taylor v. White Flint. Mr. Morrison, I believe you start off. May it please the Court, I'd like to begin my argument today with the misapplication of Rule 701 by the District Court because that issue has broad legal ramifications for the proper calculation of damages in cases involving commercial property and particularly in the areas of real estate and construction law. I urge this Court to use this case to extend what I think is considered to be a seminal decision in United States v. Johnson, which was a criminal case, to the civil business disputes in the Fourth Circuit where the formulation of cost estimates and cost projections, particularly in the tens of millions of dollars as in this case, is a frequent and critical issue. There are, of course, two questions to be resolved in this issue. The first is whether the District Court improperly permitted lay testimony, and the second question is, and if so, was the appellant harmed? With respect to the first question, it is undisputed that… …on whether you've crossed the line from being a lay witness into being an expert witness, so it seemed to me hard to draw a providential rule because it's going to be so case-specific. Well, I think the United States v. Johnson case is instructive, and again, I would urge this Court to apply that decision to business disputes, particularly real estate and construction law where trial lawyers like myself, we encounter cost estimates of this magnitude every day. And I think like many issues, the distinction between what evidence is allowed under Rule 701 as opposed to under 702 is crystallized by what happened in this case. Mr. Mader was identified, and it's undisputed, as an expert witness. He gave an opinion in his expert disclosure that he was going to testify that the cost of renovating the White Flint store was $30 to $35 million, and I'll come back to this on the harm issue. Ms. Gambino, counsel for Lord & Taylor, told the jury in closing argument that it was $31 million for the cost of the renovation of the store. And I'd like, if you could, to take down the… Isn't the line between lay and expert witnesses a little bit hazy? Not in this case, Your Honor. In a case like this? Not in this case, and I'll tell you why. I think it's clear that you can only, you can't backdoor an expert witness. They named Mr. Mader as the expert witness on a cost projection of a store he had never looked at. Can I ask how much you're relying on the fact that he was originally named as an expert witness? Let's assume he hadn't been. Very little. I just think it's instructive that he couldn't qualify under the Daubert standard. How were you prejudiced by having his testimony in? Your interest was in keeping it out, I suppose, altogether. But whether it came in under this label or that label, how were you prejudiced by that? First, it wouldn't have come in under 702. They tried to get it under 702. The district court rejected that. They withdrew him as an expert. They then offered the same opinion in his capacity as a lay witness under 701. The reason we're harmed, and I'd like to start with the closing argument, and this was a site I'd like you to note, it's Joint Appendix 5591. This is what counsel told the jury in closing argument. Whiteflint budgeted an amount for the Lord & Taylor store anywhere from the range of $31 million to $60 million. Mr. Mader's range is at the bottom end of Whiteflint's own estimates. The jury came in and awarded $31 million. Lord & Taylor now argues that that was Mr. Daubert's. If you'd have had a special verdict from the jury differentiating these out, that would have made a difference. We asked for that, Judge. You asked for that, but you haven't made a separate assignment of error for the failure to give the verdict form that you requested. I don't think the reason we didn't do that is because that would fall under abusive discretion, and I doubt that that is within the unique province of the district court. The fact that we didn't appeal that doesn't mean that we didn't ask for it. You're dealing with abusive discretion on a number of these other issues. That's no doubt. It may be somewhat hindsight, but in terms of the prejudiced argument, it seems like that it makes your argument more difficult that you didn't more aggressively pursue some way to differentiate the basis for the verdict. I've tried a lot of cases, Your Honor, and I don't know how, other than asking for the special verdict form, that would have resolved this question. That's why we did it. Was there a time when the judge was asked, here's the verdict form, are there any objections? Did you renew your objection at that point? We renewed all the objections, and there's a site in the record where the district court said to everybody, look, any objection you've made at any time throughout the trial is hereby preserved. Specifically when the judge was talking about the verdict form, you did renew an objection at that point? After he denied that, we did, certainly. And that's why we're here on the harm issue. No one can say with any degree of certainty why the jury awarded $31 million. Ms. Gambino told them that the renovation cost of the store was $31. Mr. Dauberg's estimate of lost profits on the side was $31.1. The jury came back with two questions during deliberations. The first question was, may we increase or decrease the damages, if any, as we see fit? Because they're looking at a range from $0 to $60 million. $31 to $35 million based on the renovation of the store. $23 to $31.1 million based upon the lost profits. It's risky to try speculating why a jury did what it did in a general verdict matter. I mean, I'm reluctant to do that. But the other question I have here is Mr. Mayer had some background about the knowledge of the facts of the case. The other side says he'd worked for Lord & Taylor's parent company for 40 years and had experience with other Lord & Taylor renovations. And if he had this experience and the rest, why isn't this whole matter at the end of the day just a question for the jury of weight, not admissibility, but simply the weight that should be given to the evidence. And you could cross-examine him and say he didn't have, that his experience with the other stores was irrelevant, that he hasn't taken account of the unique features of this store. There are lots of ways to go after witness. But I just don't understand why in the end we can't regard that as a matter of the weight that the jury wished to attach Mr. Mayer to Mr. Mayer's testimony rather than a question of up or down admissibility. Because I think it would violate Rule 701C that was added by an amendment in the year 2000. And that amendment makes it clear that you can't backdoor expert testimony through a lay witness, which was done here. The difference is if you look at U.S. v. Johnson. Before you go on to U.S. v. Johnson again, I just don't understand how his testimony was expert testimony. It sounded, I mean I read it, it sounded like he was just testifying based on his experience about how much this usually costs for him. There wasn't any sort of scientific method. Let me give you an example. I feel that I could give lay testimony as to what it costs to get a dishwasher fixed. Not because I'm an expert in the workings of a dishwasher. I wouldn't be reasoning out from how a dishwasher works. I would just be saying every time I call the guy, this is how much he charges me. How is this different? Because you have personal knowledge based upon your personal interaction with the salesman. Well, that's what they would ask me on cross-examination. But they didn't. Do you write the checks? Does someone else write the checks? But it would be admissible as testimony. It's not admissible in this case. You're giving a cost projection where he never, the renovation never occurred. He was asked hypothetical questions about a renovation for which he lacked the following information, all of which he could not have gotten in and, therefore, was not qualified under Rule 702. But he had renovation information from other stores, didn't he? No different, Your Honor, than a police officer in Johnson. Wait a minute. Who? Did he have renovation experience and information from other jobs that he did? He did not supervise the renovation. He was above a guy who supervised the renovation. So he had cost knowledge of certain aspects of store renovations in other states. He had never done a store renovation in Maryland. He couldn't even tell me. That's a question for cross-examination. And I cross-examined him hard. But the jury came in with a verdict of $31 million. And there's no way to know whether, because they asked. They specifically asked, and let me quote it because I think it's very important. They said, whether the damages included the cost of a new building. It was clear from the closing argument that the jury was confused about what the numbers were and how much could we award for a new store. That was $31 million. So the prejudice is there, and I think in our industry, if you allow somebody to come in to renovate a major several hundred thousand square foot store without any architectural plans, you don't have a general contractor, you don't do any bids, you don't do any cost estimating, you don't do anything, and you tell the jury, this is what he told them, you have to trust my experience. Rule 701 prohibits a layperson from giving specialized knowledge based upon what they do. Judge Harrison, your example, it's perfect. You deal with washing machines every day. You know what they cost. You know what you can do. That's permissible under Rule 701 because of the personal knowledge exception. He had no personal knowledge of this store cost. Judge Harrison's experience was limited to dishwashers she'd had fixed in other states but never in Maryland. How does your example work there? Is she now incompetent to testify? Correct. And it gets more complicated, Judge. This is critical. A washing machine is pretty simple. You want to have a store renovation, how about building an office building that's 12 stories high and you need somebody to come in and talk about the cost estimating? We're not talking really about a washing machine. We're talking about you need the plans to show you the layout. You then have to price it. You have to bid it. He didn't know anything about Maryland cost projections of any kind. He had no drawings, no cost projections. He hadn't even talked to a general contractor, much less hired one. They had no architects. He didn't do any calculations of any kind. And all of that we detail in the record at great length. If that type of witness is permitted in the real estate and construction law areas to give a $30 to $35 million cost projection, we are in trouble in this field because you'll have anybody who's remotely connected with any construction project bring them in. And it's just, and again, going back, Judge Harris, to your question, it is relevant that they tried to get him in under 702. It shows that they know what is required for a witness giving a $30 to $35 million cost projection. They have to give an opinion on that. Or they did it. If they had renovated the store, Judge Agee, and actually had the cost, just like other cases that have allowed somebody who knows what the actual costs were, but he came in in a hypothetical litigation environment to give a $30 to $35 million opinion that is expressly reserved to experts with specialized knowledge. He's not even a cost estimator. I'm sorry. You say the renovation costs were. What do you think the cost estimate should have been? Well, we said it was inflated by a lot, but you're dealing with $30 to $35 million, and the lawyer said $31. That's a lot of money. What testimony did you put on as to the cost estimate? We just cross-examined Mr. Mader, who couldn't explain anything about it. But the jury was confused by it, and that's why they came in at $31 million. Why didn't you have your own cost estimate? Well, you make a decision as to how much you fight on a damage issue like that. We felt that he never should have been allowed to testify. The district court judge agreed with us and excluded him under 702. He then allowed, changed his mind, but allowed him to come in under 702. Changing his mind would be if he had let him come in under 702. He listened to his testimony, right? He made a ruling after he listened to the testimony. But it violates the standards. Now that I have heard it. This is 701 testimony. He's testifying based on his experience with procuring construction like this. But under 701, you must have personal knowledge of the actual what occurred. As soon as you render an opinion on what might occur, what it might cost to renovate the store, you cross the line. I think you have. Then you're back to me and my dishwasher. You cross the line when you start engaging in a kind of technical scientific reasoning. If he wants to testify, you use this kind of brick, you use this kind of cement, and because of that they have these unique properties, you need the steel beam. That's one thing. But he's not doing that. He's just saying, look, I do this all the time and this is how much it costs. But he didn't do it all the time in Maryland. He never did it in Maryland. He didn't even know if Maryland has union labor or regular labor. He couldn't tell you the cost of any material involved. You have some rebuttal time. Okay, Your Honor. Thank you. It shows 56 seconds. I don't know if I can roll that into my rebuttal. I appreciate it. Thank you. Good morning, Your Honors. It's nice to be in front of the same panel that heard us before. The nice part about this, I thought, is I won't hold you up for lunch. Like I did last time since we're first in line. Michelle Gambino and David Barger, I'm here for Lord & Taylor. With me is Brian Paul, who is the President of Real Estate for HBC. That's the Hudson Bay Corporation. And Ms. Mindy Novak, who is the in-house counsel. Your Honor, the Court absolutely has captured the Mader issue, soup to nuts, exactly right. Mr. Mader had 38 years, nearly four decades of experience behind him. He came into retail. He knows the cost estimates. That's what he's done from the time he was a young man. There was 50 pages of unobjected to testimony laying out this man's background. He has put up, he testified, designed, planned, and oversaw the cost estimates with his own particular knowledge of Lord & Taylor stores from a day-to-day basis for nearly 40 years. If that doesn't fall within the parameters of 701, I don't know what does. The Court gave him a very long opportunity to testify about his background. The Court was very careful to make sure he wasn't crossing into the lines of specialized knowledge under 702. Now, something needs to be said about 702. There was an allegation that we had Mr. Mader designated as an expert, and that's just not quite accurate. What we did designate him as is a non-retained employee who may give expert testimony. Now, why we did that is because he had the day-to-day experience, and we did want to be cautious that if some of that bled over into what could be considered expert testimony, that we believed he could qualify as an expert. But we didn't need to get there. We didn't even have to qualify him. So it's not accurate in the record to say that we attempted to put him in under 702, when, in fact, we didn't have to and we didn't try. That said, he's certainly – yes, sir? Let me make sure I'm clear on the damages evidence as to the renovations. Yes, sir. As I understood Mr. Morrison's presentation, the only evidence that came in with respect to damages as it applied to renovation of the store was from your witnesses. There was no evidence from White Flint to contradict it. Is that correct? That's absolutely incorrect, and here's why. We submitted evidence in our case in chief from White Flint's own documents evidencing the cost that White Flint put on the cost to renovate. You put the evidence on. White Flint did not put on evidence. That's correct, Your Honor. We put in our case in chief their own documents that acknowledged their book value for doing these renovations to the store. And that's where their argument falls apart. They have to show that there was harmful error, even if they're right, even if the testimony shouldn't have come in under 701, which was absolutely proper. But even if they're right, they need to show that there was harm as a result of that testimony. They can't differentiate it for the very reasons this Court picked out. First, they had the opportunity. Once that evidence came in, all they needed to do is say, Your Honor, I have a special verdict for him. I would like to tender this special inauguratory to allow the Court to tender out the store costs from the lost profit testimony. It's a one-sheet piece of paper where they should have tendered that to the Court. The Court should have then ruled and not allowed that to come in. Then they've preserved it. The record is very clear if the Court goes back and looks. The Court said, as he worked day after day on getting the verdict form in order, Is there any objections to this verdict form? Are we good, is what Judge Titus said. And there was no objection from Whiteflint. Not only no objection, but they didn't tender a special question once the evidence came in. So that's waiver. And second, Your Honor, they would have to show I just want to make sure. I had understood Mr. Morrison to indicate that they did tender a different instruction. Did they tender a special verdict form that was rejected by the District Court? They did not. And that's the waiver. And, Your Honor, even if they had and they didn't, they'd still need to show $1 of that $31 million was based on Mr. Mater's testimony. Mr. Mater's testimony. As opposed to their own documents that they have that we submitted in our case in chief where they put, and I can tell the Court, it's Plaintiff's Exhibit 173. And it's also in the record at, I believe, JA 6167. And it's their own documents. So they'd have to show not only did the testimony and they got $1 from Mr. Mater, but that $1 wasn't because of their own documents. And they can't do it. They cannot differentiate it. And that means they can't show harmful error on this point. Can I just shift focus just a little bit? Absolutely, Your Honor. Lord and Taylor is saying that they were prejudiced because the jury didn't get to consider evidence of a potential economic benefit that was going to flow to you from the mall's redesign. And you respond in turn that, well, that's too speculative. Yes, Your Honor. But let me ask you this. Isn't it clear that you were going to benefit substantially from the redesign of this mall in this way? You've got a mall which, to all intents and purposes, seems more abundant. Seems, I'm sorry? More abundant. And under the present configuration, it's drawing up. Most of the tenants have left. Other anchors, as I understand it, have left. It's behind the curve in terms of what malls are trying to do these days. And so all of a sudden you have White Flint coming in with a redesign and to make it part retail and part office. Maybe there's a residential penthouse featured to it. I don't know. But it's a mixed-use mall. Correct. So why wasn't Lord and Taylor able to argue before the jury that this was going to— why wasn't White Flint able to argue to the jury that this redesign was going to revitalize the mall and sort of rescue it from its death throes and redound either sooner or later to your benefit? Now, you know, there's an area of speculative ease to it. We don't know exactly what the design was or how long it would take or whatever. But, you know, shouldn't White Flint have been allowed to put in something on that point that you— they made a business decision. It was in breach of contract. But they made a business decision from which you stand to benefit. And they weren't allowed to say anything about it. So why not? Happy to address that, Your Honor. First, to answer your question, White Flint was attempting to put on that evidence. I think the court said Lord and Taylor. But White Flint, yes, was attempting to put on that evidence. And, Your Honor, they did. They got to put on that evidence. They had many experts that come up and say, this is going to be the best thing since sliced bread for Lord and Taylor. Lord and Taylor had people that come on and said— Did the district court instruct them not to consider it? Absolutely not, Your Honor. The district— They were saying it did. Right, but all you have to do is look at the actual instruction that the judge gave the jury. And the judge—the distinction here is—and the judge was very clear. You can say this redevelopment is going to be great for Lord and Taylor all day long. But what you're asking me to do, White Flint, is to take what you have, which is right now this plan, Your Honor, one page, and speculate about how this one page design— there's no plans, there's no contractors. I'm not trying to put his accent on. But there's no plans, there's no contractors. And therefore, this guy's kind of out on a limb. You have no plans, no contractors, no permit to even build this. You have a huge disclaimer on their own drawing that says, this is a concept. This is an illustration. The final building locations, dimensions, heights, even the uses may not be retail at all. It's subject to change until we get it together and do a site plan. Then you've got to get approvals. Then you've got to know how many people are going to compete against Lord and Taylor. Then you've got to know how many people are going to shop there. Is it going to be a great place? The court was very clear. He allowed the testimony to say, this is going to be a good thing. You stand to benefit. In fact, they argued that some of our witnesses thought we may benefit. What he drew the line on, as he should have, as the gatekeeper of 702, is he would not let White Flint put on a land speculator and say, guess what? Not only am I going to guess and do 80 what-if scenarios, because I need 80 what-if scenarios for this plan because it is so far-fetched. It's just a concept at this point. But I'm going to tell you, Lord and Taylor, what you're going to make with reasonable certainty year after year after year, nearly to the penny, from now until 2055. I would love to sit here and tell the court, Apple stock from now to 2055 is going to perform like X, Y, and Z. And guess what? Does any of this have to do with the judge's instruction to the jury? I thought that was Judge Wilkinson's question. That's exactly where it is. That is the rationale that formed Judge Titus's instruction. It is far afield to basically decide from a concept how Lord and Taylor's actual book value on profits will change year over year because there's too many what-ifs. And that's what the instruction was. He didn't strike the testimony. He said because of the uncertainty of the evidence associated with both the timing and the future financial success of the redevelopment, here's the biggest thing, as well as the possible impact on Lord and Taylor. Is there any scenario that you would actually lose money under the redesign? Your Honor, we're losing it. Under the redesign, is it going to cost you profits? It's going to cost us. We went right now from this is part of the redesign right now, apparently, and we've gone from $25 million in sales, and last year we had $13 million. What's changed? This future redevelopment that still has not been designed or drafted. All they've done is knock down the mall, and I've lost over $10 million. That's harm. And it's not my burden. How do you redesign the cause of that? Well, Your Honor, they're knocking down the mall, and they've told the jury, which the jury accepted as true, they're doing this to put up the redevelopment. They make the conscious decision to breach their contract. That had consequences. Whether their decision to breach and whatever they decide building, because they still, as the testimony showed, whatever they decide to build, it is their burden to show with reasonable certainty what that would allow. No one with a straight face could come before the court and say, I know exactly what you will make on the penny now until 2055. That went too far afield. So is it fair to say, trying to distill all this down to a more simple conclusion, is the bottom line for your position on this issue that after the court heard the evidence, the court determined it was too speculative for the jury to consider and that that's not an abuse of discretion? Absolutely, Your Honor. It is the court's duty. And the court's decision. That's the bottom line of both of these. It is, Your Honor. You're absolutely correct. And just the court's rationale is so aptly, and I thought I'd have time, but I don't. But the court's decision and its rationale is on page 5332 of the JA. And he basically says, What you're asking me to do is to make a determination of the future success of an enterprise that is not yet constructed, not yet leased, not yet open, assume it will be very successful, and therefore generate lots of traffic, and therefore somehow, and this is my add-on, benefit Lord and Taylor for the next 26 years. How long does this trial go for? Three and a half weeks. Three and a half long weeks. You each have quibbles about it. Do you really want to do this thing over? I sure don't, Your Honor. I want to have an opportunity to talk about what. You're willing to lose on the cross appeal as long as you made out pretty well. Well, Your Honor, Lord and Taylor is losing money hand over fist right now. I don't think they think they made out very well. But I will tell you, I want to talk about, and I'm going to get into it just for the last minute of my time and then I'll rebuttal. What I think is the fundamental issue here that has put property rights on its head, and that is Judge Titus's ruling on the eve before trial where he struggled with the decision of whether or not he should allow William Harvey to testify about the value of the real property rights, separate from the business. Do you want to go back and try this as the damages with a separate item? I want to have a, I absolutely have real property rights that I think it would take a day full of testimony. They call their appraiser. We call our appraiser. We put on a jury to say what is the value of the easements? What is the value of the restrictive covenants? Why would you just open it up to that extent? That's all it needs to be open, Your Honor. There was not an abuse of discretion on Mr. Duquesne and there certainly wasn't on Mr. Mader. All his rulings on the evidence and all his rulings on items of damages and what could be considered that went against Whiteflint were fine with you, but suddenly the ruling that he's made on the real property rights, which he says are duplicative of other items of damages and would result in double counting, suddenly that's an egregious error as to an award of damages. I just look at this thing and I say, can't you just let well enough alone? Do you all really want to go through another three-week trial? I don't want to go through a three-week trial, but I'm happy to go through one day of testimony. And I don't want to overshoot my amount of time that I'm given, but I do want to tell the court. You've got some time for a bubble. Yes, sir. Very, very quick question. Sorry. Very quick. Are you really arguing? I understand the property thing. Are you really arguing on appeal on the fraud claim? Or have you waived? I mean, you didn't really brief the fraud claim, right? Oh, I'm sorry, Your Honor. I thought you said the question was for Mr. Morrison. It was for me. Absolutely. I mean, what the fraud claim comes down to is I believe we can, A, we didn't waive it. It's in our brief. It's in the factual scenario. We incorporate it. But what it comes down to, Your Honor, in basic form is the real harm from the fraud is Mr. Harvey's not being able to testify about the real property rights. So whether it's breach of contract or fraud, the harm is the same, and that's the evidence we want to get in. Thank you, Your Honor. Thank you. Judge Agee, I'd like to respond to the question you asked counsel. The special verdict form is at JA 1520-25. I respectfully refer the court to that because it breaks out 1520-25. And it breaks out each count. And if the court had followed that special verdict form, we wouldn't be arguing about whether the jury gave $31 million for Mr. Dahlberg or $31 million for Mr. Mader. Judge Wilkerson, to answer your question to counsel, let's look at the instruction. Here's verbatim what the district court instructed the jury after five days of testimony on what the renovated shopping center would look like. He says, I instruct you that in the event you decide to make an award of damages to the plaintiffs for lost income, you may not reduce your award because of the potentially positive economic effects of the plan redevelopment. Which page are you on now? JA 5566-67. And the reason he said that is because he was mistaken about what the law in Maryland was. And I'll quote again from Judge Titus' decision. This is at JA 5331-32. Quote, the cases, generally speaking, reject the effort of someone to recover future profits from a business that's not operating, never has operated. Now, that's a new business in Virginia under the common law can't recover in that instance. But that is not Maryland law. He instructed as a matter of law what Maryland law was. What does that have to do with the later finding that it was his determination that the evidence was just too speculative? Because the two are tied together. He used the word certain. And we all know you don't need mathematical certainty. He said you can't bring this in as a matter of law. And it just seems like to me you've got two alternative bases for his ruling here. One is, as a matter of Maryland law, you can't consider it at all. And the other was, well, just as a general matter of evidence, this is just too speculative. And the fact that he was wrong on one doesn't necessarily mean he was wrong on the other. But I think he applied the wrong standard under both. And he did not. He wrapped those into one. You can't find anywhere in the record where the district court said, I have two bases for my decision. He was confused. And, look, he's a great trial judge. Basically splitting hairs. I have the same question that my colleague does. It does seem awfully speculative. Renovation is years into the future. The concept has barely gotten off the ground. We routinely don't allow lost profits damages when you have to project years into the future. And there's a whole set of contingencies. And particularly in a business setting. I mean, business by its very nature is risk. Particularly with something like this. Particularly with real estate development. It's just loaded with risk. And I just, the district judge basically said it's all too iffy. Go back to Judge Agee's question. The bottom line is, that's a call for a trial judge to make. But it's not in this case. And I want to cite to one important piece of evidence. We had the man who's in the courtroom today testify under oath that Lord and Taylor's own projections from their store operating in the new mixed-use development would increase their gross sales by $20 million. Judge Titus excluded that evidence because he said it was too speculative. That's an admission by the other party as to how they perceive the new development to affect their profits. And Judge Wilkinson, you know from your vast experience, anchor tenants sign on to malls years before they're built. That's why they're an anchor tenant. So, in this industry, it is common for people to make judgments. Which tenants have signed on? We listed all the tenants, and I can cite it by the documentary evidence, J.A. 6537-39. We had three experts. We had Mr. Gottlieb. And we had five days of testimony. There are cases decided by this Court, and we cite these in our brief, in our reply brief, at pages 4 through 7. All of the cases, either from the Fourth Circuit itself or from states in the Fourth Circuit, where very, very, very little evidence, much less than five days of testimony here, was sufficient to go to the jury. The district court usurped the province of the jury in this case by telling me I could not argue to the court that Mr. Paul, the head of their whole real estate division himself, had estimated that the store profits would increase by $20 million. How can that be excluded as speculative? Judge Agee has a question. I'm sorry. In response to Judge Wilkinson's question, I thought he asked about, are there specific entities that have already signed on to lease property here? And I couldn't tell from your answer, referring to the pages in the joint appendix, if you've got specific tenants who have signed on to this development. Well, there isn't a signed lease, but there is a, for example, we talked, and the testimony was extensive, about the Wegmans coming in. And remember, many of the tenants that were in the White Flint Mall are going to come back in. The Wegmans signed a lease document. No, but it was in serious negotiations to do so. But you never have an anchor tenant like Lord & Taylor signing on for a new real estate venture when it's built. It's all done years in advance based upon the kinds of projections and testimony that we put on. If that evidence isn't sufficient to go to a jury on lost profits, you'll never be able to present that. And I urge the Court to review its own cases. I thought it was a basic rule of remedies in damages, whether it be for breach of contract or for tort, that, you know, damages had to be solidly grounded and that they can't be based upon emotion, they can't be based upon speculation. And there has to be a solid grounding in evidence for damages to be awarded against a party. And all of this is future. By definition, I'm sorry. By definition, Judge. Wrap it up, okay? I will. But by definition, lost profits requires some speculation because it hasn't happened yet. But lost profits are awarded every day in courtrooms around this country. Of course, but it's a question of degree. How many contingencies are there? How concrete is the design? How far in the future are we expecting, you know, it's as we've said with respect to the expert witness. It's case specific. I urge the court to review the record here and to compare it with the cases where much, much, much less evidence was deemed sufficient to go to the jury on a lost profits case. Finally, I urge the court to look at 701C on that issue that we were talking about, Judge Harris. Thank you very much. We thank you. Ms. Gambino, you have some time. Thank you, Your Honor. Remaining here. Let me just nip Mr. Decane in the bud, if I can. The court's question was who are the tenants that are signed on for the redevelopment? Zero. No one that we know of. The evidence was we asked that question many times to their leasing director, their COO. They had no one. Wegmans, the testimony before the court. What about this list he's referring to, 30 tenants? Your Honor, that's, I don't know what hypothetical list he's referring to. Is this a figment of the imagination? It absolutely is. It didn't come in, and I don't mean to be disrespectful to Mr. Morrison at all, but that's not in the record below. There's no testimony. I asked many questions to their own leasing director. Who are the tenants? I don't know yet. Do you have a leasing plan? No. They have no one signed up. The only person that Mr. Morrison could identify was Wegmans, who signed a letter of intent. That was literally, I believe it was about four years ago, and they've since said, never mind, we're not going to be here. They have nobody in the hopper lined up, Your Honor. I just want to direct the court's attention. The court's ruling was absolutely proper under Maryland law, which this court needs to apply, sitting in diversity, which was the St. Paul versus Manufactured Life Insurance Company, and the Four Circuits ruling in Coastland versus Third National. Your Honor, it's not novel law. Going to Mr. Harvey. Even if the district court was wrong on that, would your position be that the issue of speculativeness as to the degree of evidence would be a separate consideration? Absolutely, Your Honor. I mean, that is the basis. He stated in his actual ruling, with the evidence that I've heard, and that is before me, this is way too speculative to allow this to not only go to the jury on this issue, but really to then pluck and direct the jury via an instruction to then make some offset determination based upon that speculation. That's where the argument really falls apart. It wasn't that he couldn't let them say the redevelopment's going to be great, your losses are going to be short, this thing's going to be up before you know it. They argued all of that. All of that testimony came in. All of their expert testimony came in. The one statement he said, and he relied upon and said, that my agents via Lorne and Taylor made concerning what they might do, the evidence there, again, was A, that was contested. Two, he argued it during the trial and during his closing, so it wasn't like he was precluded from using that in any way. And third, the testimony said that that statement, if made, referred to a different plan they're not even building. So it has no relevance, and again, the court was proper in using his discretion to not instruct the jury to speculate. With the remaining time, Your Honor, I would like to talk about the real property rights. Here, the error that was committed by the court was pretrial, and it related to Lorne and Taylor was conveyed real property rights. And the error before the court was really real property rights are separate and distinct from a business. How do you know? Look at how normal tenant leases work. You have ground rent that you pay, which is for the real estate rights. Here, a sublease. Here, we pay for an easement. Here, we pay for a restricted covenant. And then you have often percentage rents that account for how the business does. There is a relationship that shows the business and the real property being separate and distinct. And that's where Judge Titus erred. He did not comply with, and novice sole is the case under Maryland law, and Hughes, both of which say lost profits is not the measure of damages that could be and should be the value of a property right that is taken. Notwithstanding that, Judge Titus said, I think you're getting enough damages. You're not selling enough shirts. Your expert's going to testify how you've lost profits. The problem with that, Your Honor, is, A, the breach to run a first-class mall has nothing to do with the taking of an easement. The taking of an easement is a compensable right under Maryland law that has nothing to do with whether I sell 10 shirts or 15 shirts. So it's an error of law he made under both of those cases. Second, the other problem with that, Your Honor, is, I don't understand why it would necessarily have nothing to do with lost profits. I mean, the easements, what were they? They made access easier to the store? Your Honor, there was over 20 acres of access easements that were granted. Presumably the easements were put in in some way to facilitate customer access or to enhance the attractiveness of Lord & Taylor's store to those who were going to patronize it. But think about that, Your Honor. Yes, they are an advantage, but they're not an advantage necessarily to how Lord & Taylor sells how many shirts. It's an advantage to the value of the actual sublease. That stands alone, separate and apart from the business. Lord & Taylor could close its store tomorrow and still have a valuable asset, which is a sublease that he could give to somebody else, whether it sells 10 shirts or not. That's not the determination of value. How do I know? Because Maryland's Supreme Court says. Think about it, Your Honor. If you have the Department of Transportation who comes out and says, you have 4 acres of land, you don't have to close tomorrow and still have a very valuable easement? Yes, I would because it protects because How does that become an element of damages? It becomes an element of damages because they're about to put 15 apartment buildings on top of those easements. That makes the rent I could get for my sublease go from, say, $100,000 to $60,000. Big difference when you don't have the easements. And what am I going to get for compensation? The difference in the amount of shirts I sell has nothing to do with it. Think about if the VDOT came and took, say, a 4-acre parcel and it May I ask you to wrap it up? Yes, Your Honor. What Whiteflint advocated and what the court accepted is essentially if a business is on the property and doesn't have lost profits, then the taking of real estate rights is completely irrelevant and you're not harmed. That is not the law in Maryland. I'm sorry. I thought the court really relied on this idea of kind of double-dipping. It's not obvious to me that the court comes out the same way had there been no lost profits. He just said you can't recover both. Right. And I agree you can't recover both. But Mr. Dahlberg, who gave lost profits damage testimony, Your Honor, specifically said on the record his profits analysis did not consider or even try to apportion the value of those real estate rights. It's not that there was a double-counting. The fallacy in the whole argument, Your Honor, is, and the court said, I think you're trying to get six pieces out of a four-piece pie, which always stuck with me. And here's the problem with that. We had four pieces of pie and we've gotten paid for one slice. You have three other rights. Pardon me? You made out pretty well. Thank you, Your Honor, but I'd like to make out a little bit better. It's been a pleasure. Thank you, Your Honors. Thank you. We'll come down and agree counsel and move into our next case.
judges: J. Harvie Wilkinson III, G. Steven Agee, Pamela A. Harris